## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| HWA, INC., Plaintiff, v. THE UNITED STATES, Defendant, and WACKENHUT SERVICES, INC., Defendant-Intervenor. | No. 07-615 C (Judge G. Miller) |

## PLAINTIFF'S UNOPPOSED MOTION FOR REDACTIONS

Plaintiff HWA, Inc. hereby respectfully moves the Court to adopt the redactions set forth on the attached excerpts from the Court's decision. These redactions were discussed by and between counsel for Plaintiff, Defendant and Defendant-Intervenor and neither Defendant nor Defendant-Intervenor oppose this motion.

DATED this 10th day of October, 2007.

Respectfully submitted,

HWA, INC.

By s/Mark G. Jackson
Mark G. Jackson, WSBA #18325

GARVEY SCHUBERT BARER
1191 Second Avenue, Suite 1800
Seattle, Washington 98101
(206) 464-3939
(206) 464-0125 – fax
Counsel of Record for Plaintiff

# United States Court of Federal Claims

No. 07-615 C
Filed September 26, 2007
TO BE PUBLISHED

| | |
|---|---|
| HWA, INC.,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant,<br><br>and<br><br>WACKENHUT SERVICES, INC.,<br><br>Defendant-Intervenor. | Post-award bid protest; jurisdiction; Tucker Act, 28 U.S.C. § 1491(b); Administrative Procedure Act, 5 U.S.C. § 706; arbitrary, capricious, abuse of discretion, or otherwise not in accordance with law; rational basis; violation of regulation or procedure; unequal treatment; best-value procurement; prejudice; request for quotations; permanent injunction |

Mark G. Jackson, Garvey Schubert Barer, Seattle, Washington, for plaintiff. Matthew C. Hoyer, Garvey Schubert Barer, Washington, D.C., of counsel.

Devin A. Wolak, Trial Attorney, Kirk T. Manhardt, Assistant Director, Jeanne E. Davidson, Director, Peter D. Keisler, Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant. Alton E. Woods, Emily E. Parkhurst, U.S. Department of the Interior, Washington, D.C., of counsel.

Richard J. Webber, Arent Fox LLP, Washington, D.C., for defendant-intervenor. William G. Goodrich, Jr., Lisa K. Miller, Arent Fox LLP, Washington, D.C., of counsel.

- "The contractor did not provide resumes (work experience, work history, education, training, etc.) for key personnel as required in the SOW." AR 524.
- "The proposed Contract Manager's ability to meet the requirements is questionable, due to the company not providing any supporting documentation." AR 524.
- "The contractor's quote identified key personnel but failed to provide any supporting documentation to indicate the personnel met the minimum standards in accordance with the SOW. The proposal stated that (as per SOW) resumes would be provided after the award. Insufficient information has been provided to establish eligibility." AR 525.

No deficiencies (as opposed to weaknesses) were identified in HWA's proposal. AR 522–25. On the basis of the described strengths, weaknesses, and adjectival ratings, the FPS technical evaluation team assigned HWA's technical proposal an overall technical capability rating of "satisfactory" and WSI's proposal a rating of "excellent."[6] AR 512, 521. Under the FPS's rating system, the available ratings for the technical capability factor were "excellent," "very good," "satisfactory," "poor," and "unacceptable," so HWA's rating of "satisfactory" was two steps below WSI's "excellent" rating. AR 531.

### B. Past Performance Factor

The next factor evaluated by FPS was the bidders' past performance. In descending order, the available adjectival ratings for this factor were "outstanding," "excellent," "good," "fair," "poor," "unsatisfactory," and "not applicable." AR 538. WSI's proposal received a rating of "outstanding," AR 539, which was described by FPS as appropriate for proposals in which "[t]he contractor has demonstrated an outstanding performance level that was significantly in excess of anticipated achievements and is commendable as an example to others. It is expected that this rating will be used in those rare circumstances where contractor performance clearly exceeds the performance levels described as 'Excellent.'" AR 538. HWA's proposal received a rating of "excellent," AR 540, which was described as appropriate when "[t]he contractor has substantially exceeded the contract performance requirements." AR 538. The evaluation summary compiled by FPS documents that WSI's past performance rating was based on four evaluations, all of which FPS considered both recent and relevant. AR 539. Specifically, FPS retrieved past performance information from the Past Performance Information Retrieval System (PPIRS) on a WSI contract for an unspecified agency performed over a 58-month period ending December 31, 2006, and having a total value of $25,151,684, work for which WSI's evaluation was [redacted] *Id.* FPS also obtained past performance information for two of WSI's contracts with the Department of Energy, one with a dollar value of $362,500,000 and a term of five years, and the other with a dollar value of $307,872,742 and a performance period of one year, for which WSI's work was evaluated as [redacted] *Id.* Finally, FPS obtained past performance information for a WSI contract with the Department of Homeland

---

[6] The "satisfactory" and "excellent" ratings represented "moderate risk when it comes to future expected performance" and "very low risk when it comes to future expected performance," respectively. AR 531, 536.

Security/Immigration and Customs Enforcement for a one-year contract with a value of $25,300,000, for which WSI's performance was evaluated as [redacted] *Id.*

Similarly, FPS obtained past performance information on four contracts performed by HWA. AR 540. According to the FPS evaluation summary, the National Archives and Records Administration rated HWA's performance on a contract worth $917,964 per year as [redacted] and the Federal Emergency Management Agency gave HWA a rating of "[redacted] in 'the ability to alert Government of unforeseen costs before they occur'" on a contract worth $392,282. *Id.* FPS also took into account two performance evaluations submitted by HWA along with its bid, both of which related to HWA's performance of two contracts for the Department of Homeland Security. AR 540, 1056–59. These contracts were worth $12,000,000 per year and $3,500,000 per year respectively. AR 540. On both of these evaluations, HWA received a rating of [redacted] the highest rating available on the evaluation form used, for each category appearing on the form. AR 1056–59. While FPS's descriptions of these past performance evaluations are part of the administrative record made available to the Court, none of the actual evaluation forms or questionnaires (with the exception of the HWA-Department of Homeland Security evaluations discussed immediately above) are part of the record. FPS noted that it considered all four of HWA's past performance evaluations to be recent, but only one of them was considered highly relevant. AR 540. It is unclear from the record which evaluation was considered to be most relevant.

### C. Price Factor

The third factor evaluated by FPS was price. As part of this evaluation, an independent government cost estimate was prepared, with a total estimate of a reasonable contract price of [redacted] AR 507–11, 543. The price in WSI's proposal was $85,067,300.51, the second-lowest of the eight proposals received.[7] AR 543, 728. The price in HWA's proposal was [redacted], the third-lowest proposed price, and [redacted] higher[8] than WSI's price. AR 543–44, 974.

### D. Socioeconomic Factor

The fourth and final factor evaluated by FPS was a socioeconomic factor designed to ensure "maximum small business participation." AR 492, 544–47. The adjectival ratings

---

[7] The lowest-priced contract proposal was submitted by ARES International Security, but FPS did not award the contract to this bidder because its technical capability and past performance were rated worse than those of WSI, and its socioeconomic factor rating was the same as WSI's.

[8] The administrative record indicates that FPS calculated that HWA's proposed price was [redacted] higher than WSI's price. AR 544. The Court's arithmetic, however, suggests that the correct figure is [redacted], and the Court's opinion reflects that conclusion.

AR 572. The debriefing also discussed the sources used to determine HWA's rating of "excellent" on the past performance factor:

> The experience included the current Manhattan FPS contract that represents the preponderance of the services to be included in the new contract as well as another Region 2 FPS area contract and two requirements for other agencies. The responses to the solicitation questionnaires on the two non-FPS [contracts] included overall ratings of [redacted] Letters from Region 2 included in the HWA submissions commended the firm for [redacted] service.

*Id.* Finally, the debriefing explained FPS's best value determination:

> WSI was rated higher [than HWA] on every element of the proposal with the exception of the Socio-Economic Factor. The intention of that factor was to provide an element to favor a similarly rated Small Business in making a Best Value tradeoff. In this case, however, there was no need for such a trade-off since WSI received higher ratings on Technical, Past Performance, and Price. Consequently, WSI was considered the overall best value for the instant acquisition.

AR 573.

After the debriefing, HWA filed the present bid protest action on August 20, 2007.

## *ANALYSIS*

### I. Jurisdiction

Pursuant to the Tucker Act, 28 U.S.C. § 1491(b) (2000), the United States Court of Federal Claims has jurisdiction over post-award bid protest cases.[9] The Tucker Act grants the Court of Federal Claims "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). The Tucker Act further permits the Court to "award any relief that the court considers proper,

---

[9] Section 12 of the Administrative Dispute Resolution Act of 1996 ("ADRA") gave the Court of Federal Claims jurisdiction over bid protest cases. Pub. L. No. 104–320, 110 Stat. 3870, 3874–76 (1996). Although initially both the Court of Federal Claims and the district courts had concurrent jurisdiction over bid protests, under the ADRA the district courts' jurisdiction was to terminate on January 1, 2001, unless extended by Congress. ADRA § 12(d). Congress did not renew the bid protest jurisdiction of the district courts, so the Court of Federal Claims has become the exclusive judicial forum for bid protest cases.

of the RFQ amendment has meaning, regardless of the importance of the socioeconomic factor relative to the other individual factors.

Given that the RFQ, as amended, required FPS to give more weight to the combination of technical capability, past performance, and price than to the socioeconomic factor by itself, it remains for the Court to determine whether FPS in fact followed this instruction regarding weighting in making its award decision. The Court finds that FPS applied factor weights consistent with the requirements of the amended RFQ. In making its award decision, FPS noted that WSI's proposal received ratings higher than those received by HWA in technical capability, past performance, and price. AR 543. If the combination of these three factors was treated as more important than the socioeconomic factor itself, then an award to WSI was mandated by the evaluation criteria. Thus, FPS's award to WSI demonstrates that FPS acted in accordance with the evaluation criteria established in the third amendment to the RFQ.

3. HWA Has Not Shown a Lack of a Rational Basis in FPS's Evaluation of the Past Performance Factor in HWA's Proposal.

HWA's final argument that FPS's evaluation and award decision lacked a rational basis relates to FPS's assignment of a rating of "excellent" to HWA's proposal as it related to past performance.[18] HWA argues that it instead should have received a rating of "outstanding" because its performance as the provider of guard services in Manhattan, where it was the incumbent contractor for approximately 80 percent of the work to be awarded under RFQ 62949, had been rated by FPS as [redacted] the highest rating available on the questionnaire that FPS completed. Both in its briefs and at oral argument, HWA argued that, given its achievement of the highest rating available for its past performance of services identical to those representing a significant portion of the work to be performed under the RFQ, any past performance rating in FPS's evaluation other than the highest rating possible must be without any rational basis and must be due to FPS's ignoring HWA's documented past performance.

The past performance ratings available in FPS's evaluation of the proposals were "outstanding," "excellent," "good," "fair," "poor," "unsatisfactory," and "not applicable." AR 538. Setting aside the "not applicable" rating, which would be used in the event the agency was "[u]nable to provide a score," there were three ratings—good, excellent, and outstanding—for past performance at or above the level expected of a winning bidder, and there were three ratings—fair, poor, and unacceptable—for past performance below the level expected. *Id.* Specifically, the rating of "excellent" was to be awarded where "[t]he contractor has substantially exceeded the contract performance requirements," and the rating of "outstanding" was for situations in which "[t]he contractor has demonstrated an outstanding performance level that was significantly in excess of anticipated achievements and is commendable as an example to others." *Id.* In addition, "[i]t [was] expected that th[e outstanding] rating [would] be used in

---

[18] At oral argument, counsel for HWA conceded that HWA does not question the past performance rating of "outstanding" given to WSI's proposal.

those rare circumstances where contractor performance clearly exceed[ed] the performance levels described as 'excellent.'" *Id.*

HWA's past performance rating was assigned based on four evaluations of its performance. HWA submitted two completed evaluation questionnaires as part of its proposal, one for its work for FPS in Manhattan between 2000 and 2005, and one for its work for FPS in Brooklyn between 2003 and 2005. AR 1056–59. On both of these questionnaires, FPS rated HWA's performance as [redacted] in every category; the available ratings were limited to [redacted] and [redacted] *Id.* In addition, HWA identified two additional contracts for which it suggested FPS obtain information regarding its past performance, one for the National Archives and Records Administration ("NARA") at the Harry S. Truman Library in Independence, Missouri, and one for the Federal Emergency Management Agency ("FEMA") in Bothell, Washington. AR 1061–62. HWA did not submit completed questionnaires for these contracts, but FPS contacted HWA's references and determined that "[o]n a $917,964 [per year] effort, NARA rated HWA as [redacted] throughout," and that "[o]n a $392,282 effort, FEMA rated HWA as [redacted] in 'the ability to alert Government of unforeseen costs before they occur.'" AR 540.

HWA's first argument is that FPS, in conducting its evaluation, "ignored the obvious fact that Plaintiff was the incumbent in 80% of the work (90% if its proposed subcontractor was counted) and had received the highest possible past performance evaluation score from the very agency making the award." Pl.'s Mot. 28; Pl.'s Response 11. This argument is easily disposed of, because the Award Evaluation Summary document reflects FPS's consideration of HWA's performance on the Manhattan contract. Specifically, after laying out the past performance information FPS received from NARA and FEMA, FPS goes on to note the past performance information it had regarding HWA's work for FPS: "On a $12,000,000 [per year] effort, the Department of Homeland Security rated HWA as [redacted] On a $3,500,000 [per year] effort, the Department of Homeland Security also rated HWA as [redacted]" AR 540. Thus, FPS did not ignore HWA's performance on the Manhattan contract.

HWA goes on to argue that a later statement in the Award Evaluation Summary reflects ignorance of HWA's Manhattan work. Specifically, the document states

> HWA past performance, although rated "Excellent," its references [sic] were for requirements significantly smaller in scope and not relevant to the size of this requirement.

AR 546–47. This statement comes in the context of explaining FPS's decision to award to WSI instead of HWA. The paragraph from which this quotation is taken also mentions HWA's price ("$2,214,132 higher than WSI['s price]") and HWA's technical capability rating ("included several weaknesses" and "the technical evaluation team found the HWA quote lacked sufficient information to determine its eligibility"). *Id.* Although HWA focuses on this statement's failure to mention the Manhattan contract as evidence that FPS failed to consider the Manhattan

contract, the discussion of HWA's past performance elsewhere in the document (and discussed above) shows that FPS did in fact consider HWA's work providing guard services in Manhattan. In addition, the statement at AR 546–47 regarding HWA's past performance is entirely rational and reasonable. The independent government cost estimate of the work to be performed under RFQ 62949 was over $95 million, or $19 million per year. HWA's own price quotation was for [redacted] million, or approximately [redacted] million per year. The past performance information HWA supplied was for contracts of $400,000 per year, $900,000 per year, $3.5 million per year, and $12 million per year. Three of these amounts are clearly "significantly smaller" than the [redacted] million or [redacted] million per year involved in the contract at issue.[19] Although reasonable minds could differ as to whether there is a "significant" difference between HWA's $12 million per year effort in Manhattan and the planned [redacted] million effort for the Manhattan, Bronx, and Long Island federal buildings, the Court cannot say that finding this difference of [redacted] million per year to be significant is unreasonable or irrational.

Finally, HWA's argument demonstrates confusion on its part regarding the definitions of the available past performance ratings. HWA insists that, because it received "the highest possible past performance evaluation score" regarding its Manhattan work, there can be no basis for giving its current proposal any past performance rating other than the highest rating available. As the government points out, "HWA apparently believes that its proposal is entitled to a presumption of perfection." Def.'s Mot. 27. If HWA does believe this, it is mistaken. FPS is entitled to use its judgment and discretion to determine how to assign past performance ratings, and it is an acceptable practice to assume a rating in the middle of the scale is warranted, and then to move proposals to a higher or lower rating depending on the information gleaned from past performance questionnaires. *See Beta Analytics Int'l, Inc. v. United States*, 67 Fed. Cl. 384, 400 (2005) (holding that assigning a perfect score to every proposal that meets the SOW requirements "would actually increase the chance of arbitrary awards—since contracting officers would often be picking between offerors who are exactly even in evaluated quality"). In evaluating HWA's past performance, FPS was faced with the task of translating the "superior" ratings achieved by HWA on a 3-rating scale to ratings on FPS's current 6-rating scale. In other words, FPS needed to map the superior, acceptable, and unacceptable ratings to a scale on which outstanding, excellent, good, fair, poor, and unacceptable ratings were available. The Court sees nothing irrational about treating a rating of [redacted] on the 3-rating scale as equivalent to a rating of "excellent" on the 6-rating scale. The rating of "excellent" was to be awarded where "[t]he contractor has substantially exceeded the contract performance requirements," AR 538, and a rating of [redacted] on the FPS questionnaire was one step above "acceptable" and therefore represented a level of performance substantially in excess of that required to meet expectations. Given the description of the "excellent" rating in this evaluation, it appears to map very well to the [redacted] rating on the FPS questionnaire. It certainly is not unreasonable or irrational to equate the two.

---

[19] At oral argument, counsel for HWA conceded that the NARA and FEMA contracts were significantly smaller than the contract anticipated under the RFQ and that FPS therefore acted reasonably in regarding these contracts as irrelevant. The Court agrees.

FPS might reasonably have allowed the rating of [redacted] on the 3-rating scale to map to *either* "excellent" or "outstanding" on the 6-rating scale, depending on the other past performance information available. In this case, that other information might reasonably have supported giving HWA the lower of these two ratings, because the other information rated HWA generally as [redacted] or [redacted] rather than as "outstanding," on contracts much smaller in scope than the contract to be awarded under RFQ 62949. AR 540. Given that FPS's actions in assigning HWA's proposal a rating of "excellent" for past performance were rational, it is not open to the Court to substitute its own judgment and mandate a rating of "outstanding." *Dismas Charities, Inc. v. United States*, 61 Fed. Cl. 191, 207 (2004).

The Court is mindful that FPS was bound to compare the individual bidders' past performance to the descriptions of the various available adjectival ratings and not to one another, but the Court believes that a direct comparison of HWA's and WSI's past performance information demonstrates FPS's reasonable evaluation of the past performance factor. The duration of the contracts is similar in both cases, with most of the evaluated contracts having durations of over four years. WSI's past performance demonstrates a record of performance stretching back to 1999, while HWA's record reaches to 2000, an insignificant difference. But in contract size, measured either in total dollars or in dollars per year, WSI's contracts are significantly larger. The smallest of WSI's contracts (both in total value and yearly value) was still worth almost $4.3 million per year, larger than any of HWA's contracts except the Manhattan guard services contract. WSI's other contracts were worth between 5.8 and 17.4 times this amount. Thus, while HWA's performance was excellent, it came on contracts that were significantly smaller than those of WSI. Even if WSI's performance had been regarded as objectively identical in quality, FPS was entitled to take into account the size of the contracts for which past performance was evaluated, because, as FPS recognized, the size of the contract helps indicate whether the level of performance established on that contract is likely to carry over to the work under consideration. Given the large disparity in the size of the contracts HWA and WSI have performed, FPS did not act irrationally or unreasonably in giving the different past performance ratings that it did to the two bidders.

## *CONCLUSION*

For the reasons stated above, the Court concludes as follows. First, the evidence in the administrative record does not show any unequal treatment of WSI's and HWA's proposals by FPS with respect to their proposed Corporate Security Officers. Second, the evidence in the administrative record fails to show any unequal treatment of the proposals by FPS with respect to the proposed Contract Managers. Third, the evidence establishes that FPS irrationally evaluated the personnel qualifications subfactor in HWA's proposal, but this error was not prejudicial, because, even in the absence of the error, HWA would still not have had a substantial chance of being awarded the contract. Fourth, the evidence does not show that FPS abused its discretion in applying the socioeconomic factor to make its final award decision. Finally, the evidence does not establish that FPS acted irrationally or unreasonably in evaluating HWA's past performance.