# United States Court of Federal Claims

No. 07-615 C
Filed September 26, 2007
Reissued October 16, 2007*
TO BE PUBLISHED

| | |
|---|---|
| HWA, INC., | Post-award bid protest; |
| | jurisdiction; Tucker Act, 28 |
| Plaintiff, | U.S.C. § 1491(b); |
| | Administrative Procedure Act, 5 |
| v. | U.S.C. § 706; arbitrary, |
| | capricious, abuse of discretion, |
| THE UNITED STATES, | or otherwise not in accordance |
| | with law; rational basis; |
| Defendant, | violation of regulation or |
| and | procedure; unequal treatment; |
| | best-value procurement; |
| WACKENHUT SERVICES, INC., | prejudice; request for |
| | quotations; permanent |
| Defendant-Intervenor. | injunction |

Mark G. Jackson, Garvey Schubert Barer, Seattle, Washington, for plaintiff.  Matthew C. Hoyer, Garvey Schubert Barer, Washington, D.C., of counsel.

Devin A. Wolak, Trial Attorney, Kirk T. Manhardt, Assistant Director, Jeanne E. Davidson, Director, Peter D. Keisler, Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant.  Alton E. Woods, Emily E. Parkhurst, U.S. Department of the Interior, Washington, D.C., of counsel.

Richard J. Webber, Arent Fox LLP, Washington, D.C., for defendant-intervenor. William G. Goodrich, Jr., Lisa K. Miller, Arent Fox LLP, Washington, D.C., of counsel.

---

* This Opinion and Order was originally filed under seal on September 26, 2007, pursuant to the protective order entered in this action on August 22, 2007.  The parties were given an opportunity to advise the Court of their views with respect to what information, if any, should be redacted under the terms of the protective order.  The plaintiff filed an unopposed motion (docket entry 41) on October 10, 2007, proposing certain redactions, which the Court has adopted. Accordingly, the Court is reissuing its Opinion and Order dated September 26, 2007, with the agreed redactions indicated by three consecutive asterisks within brackets.  The Court has also made minor editorial revisions.

<u>**OPINION AND ORDER**</u>

<u>GEORGE W. MILLER</u>, Judge.

This post-award bid protest action is before the Court on plaintiff's cross-motion for judgment on the administrative record[1] and for permanent injunction ("Pl.'s Mot.," docket entry 33), defendant's motion for judgment upon the administrative record ("Def.'s Mot.," docket entry 34), and defendant-intervenor's motion for summary [sic] judgment on the administrative record ("WSI's Mot.," docket entry 32), all filed September 7, 2007.  Plaintiff filed its consolidated response ("Pl.'s Response," docket entry 36) on September 19, 2007.  Defendant also filed its response ("Def.'s Response," docket entry 37), as did defendant-intervenor ("WSI's Response," docket entry 35), on September 19, 2007.  The Court held a hearing on the motions on September 24, 2007.

For the reasons set forth below, the motion of plaintiff HWA, Inc. for judgment on the administrative record is DENIED, and the motions of defendant and defendant-intervenor Wackenhut Services, Inc. for judgment on the administrative record are GRANTED.

## *BACKGROUND*

**I.      The RFQ and its Amendments**

On December 4, 2006, the U.S. Department of Homeland Security, Immigration and Customs Enforcement, Federal Protective Service ("FPS"), through the Gov.Works Federal Acquisition Center, issued Request for Quotation ("RFQ") number 62949.  Administrative Record ("AR") 272.  The RFQ sought quotations from prospective vendors to provide armed and unarmed guard services for Federal buildings in the New York region, specifically in Manhattan, the Bronx, and Long Island.  *Id.*  Only prospective vendors holding Federal Supply Schedule 84 contracts with the General Services Administration were to be allowed to provide quotations under RFQ 62949.  *Id.*  As initially issued, the RFQ anticipated the award of a single labor hour/time and material task order.  AR 272–73.  Bidders were asked to submit quotations for a single-year base contract period and four one-year option periods.  *Id.*

The RFQ stated that each proposal received would be evaluated on four factors: technical capability, past performance, price, and a socioeconomic factor (which was to allow the government to "give consideration to small businesses and to large businesses which plan to utilize small businesses").  AR 273, 278.  According to the RFQ, these factors would be used to evaluate proposals to determine which proposal offered the government the best value.  AR 277.

---

[1] *See* Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"); *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (describing former RCFC 56.1, predecessor of the present RCFC 52.1, as "a rule designed to provide for a trial on a paper record, allowing for fact-finding by the trial court").

The technical capability factor was to be evaluated using three subfactors: management approach, technical capabilities, and successful completion of comparable work, with "the superior plan" to be considered preferable "[a]mong proposals that are technically acceptable." AR 278.  Each bidder's past performance was to be evaluated on the basis of information submitted by the bidders regarding contracts awarded to them in the past 24 months, and the government reserved the right to obtain further past performance information from other sources.  AR 275–76.

After the original RFQ was issued, the government amended it on four occasions.  The first amendment, on January 4, 2007, merely extended the deadline to respond to the RFQ from December 22, 2006, to January 25, 2007.  AR 271.  Amendment 2, on January 12, 2007, replaced the Statement of Work ("SOW") in the original RFQ with a completely new document.  AR 61–270.  This amendment also contained more detailed information on how the government would evaluate the socioeconomic factor.  Specifically, when a bidder planned to have a small business (either the bidder itself or one or more of its subcontractors) perform 90 percent or more of the work, the government would give that bidder's proposal a rating of "excellent" on this factor; bidders planning for less than 24 percent of the work to be performed by a small business would receive a rating of "poor."[2]  AR 62.  The third amendment to the RFQ, issued January 22, 2007, changed the relative weight the government would assign to each of the four evaluation factors.  Specifically, this amendment provided that "Technical Capability, Past Performance, and Price are in descending order of importance and, when combined, are more important than Socio-Economic factors."  AR 60.  Finally, the fourth amendment changed the planned contract from a task order to a blanket purchase agreement ("BPA") with fixed unit prices.  AR 17.  This amendment provided the bidders with an estimated number of hours in each year of the contract for each type of guard to be provided and for each Federal building location, so that each bidder's total price was made up of the aggregate of its proposed prices per hour multiplied by the government-provided numbers of hours.  AR 17–25.

## II.   Evaluation of Proposals

FPS received timely proposals from eight bidders, including both plaintiff HWA, Inc. ("HWA") and defendant-intervenor Wackenhut Services, Inc. ("WSI").  AR 530–31.  FPS evaluated each of the eight proposals it received by giving each proposal an adjectival rating on each of three factors—technical capability, past performance, and socioeconomic factor—and also by examining the total contract price proposed in each bid.  AR 543.  Although HWA was the incumbent contractor for the Manhattan portion of the work to be performed under the RFQ, AR 201, 572, it does not appear that FPS counted this fact either favorably or unfavorably when

---

[2] Other ratings were available in addition to "excellent" and "poor"; these ratings were to be given for various levels of small business involvement in between those described here.  AR 62.  The additional available ratings, none of which were ultimately assigned to either HWA or WSI, are explained below.  *See infra* p. 9.

evaluating HWA's proposal, apart from acknowledging HWA's incumbency in describing HWA's past contract performance.[3]

## A.      Technical Capability Factor

For the technical capability factor, FPS convened a three-member technical evaluation team to evaluate three subfactors—management approach and technical capabilities, personnel qualifications, and organizational experience—for each proposal.[4]   AR 512–29.   The team evaluated each subfactor using several specified elements.   *Id.*   Based on the adjectival ratings assigned to the elements within a particular subfactor, the evaluation team assigned each proposal an adjectival rating for the subfactor in question, and the team then used those subfactor ratings to determine an overall rating for the proposal's technical capability factor.   *Id.*   The technical evaluation team documented the strengths, weaknesses, and deficiencies (if any) it identified in the proposals that allowed it to assign ratings to each individual element.   *Id.*   As shown below, with respect to WSI's proposal, the FPS technical evaluation team did not identify any weaknesses or deficiencies on any element, and the team identified strengths on all elements, while the team identified fewer strengths and some weaknesses in HWA's proposal.   AR 513–16, 522–25.   This led the team to assign the ratings shown in Table 1 for each element and subfactor within the technical capability factor evaluation.

[3] HWA also alleges in its motion that Johnson Security Bureau ("Johnson"), which HWA identified in its proposal as its proposed subcontractor, was the incumbent contractor for the Bronx portion of the RFQ.   Pl.'s Mot. at 6.   This appears to be generally supported by the administrative record.   AR 201, 987.   As with HWA's incumbency, the fact that Johnson was the incumbent contractor for a portion of the RFQ does not appear to have counted either for or against HWA in FPS's evaluation—for instance, it appears that no information about Johnson's past performance was either submitted by HWA or obtained by FPS.

[4] The Court presumes that this analysis was conducted for each of the eight proposals submitted in response to RFQ 62949.   The Administrative Record shows that the analysis was in fact conducted for the HWA and WSI proposals.

Table 1
Technical Evaluation Factors, Subfactors, and Ratings
HWA and WSI Proposals[5]

| Subfactor | Element | Identified Strengths, Weaknesses, and Ratings | |
|---|---|---|---|
| | | WSI | HWA |
| Management Approach and Technical Capabilities | 1. Understanding of the work, including creativity and thoroughness shown in understanding the objectives of the SOW and specific tasks, and planned execution of the project. | Strength<br><br>Excellent | Strength<br><br>Very Good |
| | 2. Evidence of specific methods and techniques for completing each discrete task, to include such items as quality assurance, and customer service. | Strength<br><br>Excellent | Strength<br><br>Satisfactory |
| | 3. Ability to address anticipated potential problem areas, and creativity and feasibility of solutions to problems and future integration of new processes and technology enhancements. | Strength<br><br>Excellent | Strength<br><br>Satisfactory |
| | 4. Degree to which the offerors [sic] proposal demonstrates an understanding of logistics, schedule, and any other issues the government should be aware of. | Strength<br><br>Very Good | Strength<br><br>Satisfactory |
| | 5. Quality and effectiveness of the allocation of personnel and resources. | Strength<br><br>Very Good | Strength and Weakness<br><br>Satisfactory |
| | **Overall Subfactor Rating** | **Excellent** | **Satisfactory** |
| Personnel Qualifications | 1. The currency, quality, and depth of experience of individual personnel in working on similar projects.  Similar projects must convey similarity in topic, dollar value, workload, duration, and complexity. | Strength<br><br>Excellent | Weakness<br><br>Satisfactory |
| | 2. Quality and depth of education and experience on other projects which may not be similar enough to include in response to #1 (immediately above) but [which] may be relevant. | Strength<br><br>Excellent | Weakness<br><br>Satisfactory |

[5] Table 1 is drawn from the information presented at AR 512–16, 521–25.

| Subfactor | Element | Identified Strengths, Weaknesses, and Ratings | |
| --- | --- | --- | --- |
| | | WSI | HWA |
| | 3. The currency, quality, and depth of how the Project Director will supervise and coordinate the workforce. | Strength | Strength |
| | | Excellent | Very Good |
| | **Overall Subfactor Rating** | **Excellent** | **Very Good** |
| Organizational Experience | 1. Evidence that the organization has current capabilities; and for assuring performance of this requirement. [sic] Evidence of supporting contractors, consultants, and business partners will be considered. | Strength  Very Good | Strength  Very Good |
| | 2. Appropriate mix and balance of education and training of team members. | Strength  Very Good | Weakness  Satisfactory |
| | **Overall Subfactor Rating** | **Very Good** | **Satisfactory** |
| **Overall Technical Rating Based on All Subfactors** | | **EXCELLENT** | **SATISFACTORY** |

Thus, with respect to HWA's proposal, the team identified strengths on seven elements—all of the elements except "[t]he currency, quality, and depth of experience of individual personnel in working on similar projects" (an element of the personnel qualifications subfactor), "[q]uality and depth of education and experience on other projects which may not be similar enough to include in response to [the previous element]" (also an element of the personnel qualifications subfactor), and "[a]ppropriate mix and balance of education and training of team members" (an element of the organizational experience subfactor). AR 522–25. The team also noted four weaknesses in HWA's proposal, on the elements of "[q]uality and effectiveness of the allocation of personnel and resources" (an element of the management approach and technical capabilities subfactor), "[t]he currency, quality, and depth of experience of individual personnel in working on similar projects" (an element of the personnel qualifications subfactor), "[q]uality and depth of education and experience on other projects which may not be similar enough to include in response to [the previous element]" (also an element of the personnel qualifications subfactor), and "[a]ppropriate mix and balance of education and training of team members" (an element of the organizational experience subfactor). *Id.* The weaknesses in HWA's proposal were specified to be:

•    "The 'Corporate Security Officer' is identified as working with the COTR on all areas of quality control. The [Statement of Work ("SOW")] requires the Corporate Security Officer position to serve as a liaison with FPS on all security-related matters, not quality control issues." AR 523.

- "The contractor did not provide resumes (work experience, work history, education, training, etc.) for key personnel as required in the SOW."  AR 524.
- "The proposed Contract Manager's ability to meet the requirements is questionable, due to the company not providing any supporting documentation."  AR 524.
- "The contractor's quote identified key personnel but failed to provide any supporting documentation to indicate the personnel met the minimum standards in accordance with the SOW.  The proposal stated that (as per SOW) resumes would be provided after the award.  Insufficient information has been provided to establish eligibility."  AR 525.

No deficiencies (as opposed to weaknesses) were identified in HWA's proposal.  AR 522–25.  On the basis of the described strengths, weaknesses, and adjectival ratings, the FPS technical evaluation team assigned HWA's technical proposal an overall technical capability rating of "satisfactory" and WSI's proposal a rating of "excellent."[6]  AR 512, 521.  Under the FPS's rating system, the available ratings for the technical capability factor were "excellent," "very good," "satisfactory," "poor," and "unacceptable," so HWA's rating of "satisfactory" was two steps below WSI's "excellent" rating.  AR 531.

**B.      Past Performance Factor**

The next factor evaluated by FPS was the bidders' past performance.  In descending order, the available adjectival ratings for this factor were "outstanding," "excellent," "good," "fair," "poor," "unsatisfactory," and "not applicable."  AR 538.  WSI's proposal received a rating of "outstanding," AR 539, which was described by FPS as appropriate for proposals in which "[t]he contractor has demonstrated an outstanding performance level that was significantly in excess of anticipated achievements and is commendable as an example to others.  It is expected that this rating will be used in those rare circumstances where contractor performance clearly exceeds the performance levels described as 'Excellent.'"  AR 538.  HWA's proposal received a rating of "excellent," AR 540, which was described as appropriate when "[t]he contractor has substantially exceeded the contract performance requirements."  AR 538.  The evaluation summary compiled by FPS documents that WSI's past performance rating was based on four evaluations, all of which FPS considered both recent and relevant.  AR 539.  Specifically, FPS retrieved past performance information from the Past Performance Information Retrieval System (PPIRS) on a WSI contract for an unspecified agency performed over a 58-month period ending December 31, 2006, and having a total value of $25,151,684, work for which WSI's evaluation was [* * *].  *Id.*  FPS also obtained past performance information for two of WSI's contracts with the Department of Energy, one with a dollar value of $362,500,000 and a term of five years, and the other with a dollar value of $307,872,742 and a performance period of one year, for which WSI's work was evaluated as [* * *].  *Id.*  Finally, FPS obtained past performance information for a WSI contract with the Department of Homeland Security/Immigration and

---

[6] The "satisfactory" and "excellent" ratings represented "moderate risk when it comes to future expected performance" and "very low risk when it comes to future expected performance," respectively.  AR 531, 536.

Customs Enforcement for a one-year contract with a value of $25,300,000, for which WSI's performance was evaluated as [* * *].  *Id.*

Similarly, FPS obtained past performance information on four contracts performed by HWA.  AR 540.  According to the FPS evaluation summary, the National Archives and Records Administration rated HWA's performance on a contract worth $917,964 per year as [* * *] and the Federal Emergency Management Agency gave HWA a rating of "[* * *] in 'the ability to alert Government of unforeseen costs before they occur'" on a contract worth $392,282.  *Id.*  FPS also took into account two performance evaluations submitted by HWA along with its bid, both of which related to HWA's performance of two contracts for the Department of Homeland Security.  AR 540, 1056–59.  These contracts were worth $12,000,000 per year and $3,500,000 per year respectively.  AR 540.  On both of these evaluations, HWA received a rating of [* * *], the highest rating available on the evaluation form used, for each category appearing on the form.  AR 1056–59.  While FPS's descriptions of these past performance evaluations are part of the administrative record made available to the Court, none of the actual evaluation forms or questionnaires (with the exception of the HWA-Department of Homeland Security evaluations discussed immediately above) are part of the record.  FPS noted that it considered all four of HWA's past performance evaluations to be recent, but only one of them was considered highly relevant.  AR 540.  It is unclear from the record which evaluation was considered to be most relevant.

## C.    Price Factor

The third factor evaluated by FPS was price.  As part of this evaluation, an independent government cost estimate was prepared, with a total estimate of a reasonable contract price of $[* * *].  AR 507–11, 543.  The price in WSI's proposal was $85,067,300.51, the second-lowest of the eight proposals received.[7]  AR 543, 728.  The price in HWA's proposal was $[* * *], the third-lowest proposed price, and [* * *]% higher[8] than WSI's price.  AR 543–44, 974.

## D.    Socioeconomic Factor

The fourth and final factor evaluated by FPS was a socioeconomic factor designed to ensure "maximum small business participation."  AR 492, 544–47.  The adjectival ratings

---

[7] The lowest-priced contract proposal was submitted by ARES International Security, but FPS did not award the contract to this bidder because its technical capability and past performance were rated worse than those of WSI, and its socioeconomic factor rating was the same as WSI's.

[8] The administrative record indicates that FPS calculated that HWA's proposed price was [* * *]% higher than WSI's price.  AR 544.  The Court's arithmetic, however, suggests that the correct figure is [* * *]%, and the Court's opinion reflects that conclusion.

available for the socioeconomic factor were, in descending order, "excellent," "very good," "good," "fair," and "poor." In accordance with the second amendment to the RFQ, AR 62, FPS assigned these ratings as follows:

- Excellent: "When 90 percent or more of the project will be performed by a small business." AR 545.
- Very Good: "When at least 75 percent but not more than 89 percent [of the project] will be performed by a small business." *Id.*
- Good: "When at least 50 percent but not more than 74 percent of the project will be performed by a small business." *Id.*
- Fair: "When at least 25 percent but not more than 49 percent [of the project] will be performed by a small business." *Id.*
- Poor: "When less than 24 percent of the project will be performed by a small business." *Id.*

FPS noted that the percentages of work performed by small businesses for purposes of determining the socioeconomic factor rating would be expressed in terms of "a percentage of the overall total quote in dollars." AR 545. Based on the planned award from RFQ 62949 against the successful vendor's GSA Federal Supply Schedule contract, the "GSA's determination of [a] proposed vendor['s] classification" was used to determine whether each vendor (and/or their proposed subcontractors) qualified as a small business. *Id.* FPS assigned WSI's proposal a rating of "poor" on this factor, because WSI "is an 'other than small' business." *Id.* HWA's proposal was assigned a rating of "excellent" on this factor, because HWA "is a small, veteran-owned, SBA-certified small business" and because HWA planned to subcontract to Johnson Security, a "Black American-owned, DOT-certified, disadvantaged business located in a labor surplus area." AR 546.

### E.    Award Decision

In accordance with the third amendment to the RFQ, AR 60, FPS evaluated the proposals by weighting the four factors in such a way that "Technical Capability, Past Performance, and Price are in descending order of importance and when combined, are more important than Socio-Economic Factors." AR 547. Specific percentage weights assigned to each factor are not evident from the administrative record, and in fact the amendments to the RFQ appear to rule out any comprehensive scheme of precise factor weights. AR 499 ("All other 'Evaluation Factors' [other than the socioeconomic factor] shall be evaluated based completely on adjectival ratings."). As discussed above, FPS assigned WSI's proposal the highest possible adjectival rating on both the technical capability factor and the past performance factor, FPS assigned WSI's proposal the lowest possible rating on the socioeconomic factor, and FPS found that WSI's proposal had the second-lowest price of the eight proposals received. With respect to HWA's proposal, FPS assigned the third-highest of five possible ratings in technical capability, the second-highest of seven possible ratings in past performance, and the highest possible rating in socioeconomic factor. FPS found that HWA's proposal had the third-lowest price of the eight

proposals received.  On this basis, FPS selected WSI to receive the award.  AR 548.  In determining which proposal should result in the contract award, FPS stated that

> HWA, a small business, received a "Satisfactory" technical rating, but included several weaknesses.  Overall, the technical evaluation team found the HWA quote lacked sufficient information to determine its eligibility.  In addition, [the] HWA quote was $[* * *] higher than WSI.  HWA past performance, although rated "Excellent," [was based on] references [that] were for requirements significantly smaller in scope and not relevant to the size of this requirement.  Given the critical nature of this requirement, it is not in the Government's best interest to award to HWA.  Based on the evaluation criteria, the ratings for technical, past performance, and price combined are more important than the socio-economic rating.  WSI['s] combined ratings for technical, past performance, and price are significantly superior to the other offers.

AR 546–47.

## III.   Post-Award Proceedings

Following notification to the bidders that WSI had been awarded the blanket purchase agreement, AR 549, HWA contacted George Shirley, the contracting officer for FPS, and requested a debriefing.  AR 568–70.  Notes of the debriefing are presented in the administrative record at AR 571–73.  According to these notes, the debriefing was held by telephone at 1:30 p.m. on August 3, 2007.  AR 571.  Present on the call were Mr. Shirley for FPS and J. Thomas Wood and Barbara Wood for HWA.  *Id.*  During the debriefing, it appears that FPS reiterated that four factors—technical capability, past performance, price, and socioeconomic—were used to evaluate the proposals, with technical capability more important than past performance, with past performance more important than price, and with the combination of technical capability, past performance, and price more important than the socioeconomic factor.  *Id.*  FPS also seems to have presented HWA with information regarding what adjectival rating each of the eight proposals received, and what price was associated with each proposal.  AR 571–72.  During the debriefing, FPS explained HWA's rating of "satisfactory" on the technical capability factor by pointing out the identified strengths and weaknesses of HWA's technical proposal:

> The proposal strengths identified by the Technical Board included an emergency contingency plan that was formulated based on the contractor's first hand experience in its Manhattan FPS contract during the 911 crisis.  The contractor demonstrated strong coverage with six QC monitors that would be available at all times for inspections as well as a hands-on management approach to ensure performance evaluation is scheduled and well documented.  The board considered the failure of HWA to document the key personnel experience, particularly that of the Contract Manager, with supporting resumes was a weakness that hindered its ability to clearly determine the expertise of the proposed personnel.

10

AR 572.  The debriefing also discussed the sources used to determine HWA's rating of "excellent" on the past performance factor:

> The experience included the current Manhattan FPS contract that represents the preponderance of the services to be included in the new contract as well as another Region 2 FPS area contract and two requirements for other agencies.  The responses to the solicitation questionnaires on the two non-FPS [contracts] included overall ratings of [* * *].  Letters from Region 2 included in the HWA submissions commended the firm for [* * *] service.

*Id.*  Finally, the debriefing explained FPS's best value determination:

> WSI was rated higher [than HWA] on every element of the proposal with the exception of the Socio-Economic Factor.  The intention of that factor was to provide an element to favor a similarly rated Small Business in making a Best Value tradeoff.  In this case, however, there was no need for such a trade-off since WSI received higher ratings on Technical, Past Performance, and Price.  Consequently, WSI was considered the overall best value for the instant acquisition.

AR 573.

>     After the debriefing, HWA filed the present bid protest action on August 20, 2007.

## *ANALYSIS*

## I.   <u>Jurisdiction</u>

Pursuant to the Tucker Act, 28 U.S.C. § 1491(b) (2000), the United States Court of Federal Claims has jurisdiction over post-award bid protest cases.[9]  The Tucker Act grants the Court of Federal Claims "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).  The Tucker Act further permits the Court to "award any relief that the court considers proper,

---

[9] Section 12 of the Administrative Dispute Resolution Act of 1996 ("ADRA") gave the Court of Federal Claims jurisdiction over bid protest cases.  Pub. L. No. 104–320, 110 Stat. 3870, 3874–76 (1996).  Although initially both the Court of Federal Claims and the district courts had concurrent jurisdiction over bid protests, under the ADRA the district courts' jurisdiction was to terminate on January 1, 2001, unless extended by Congress.  ADRA § 12(d).  Congress did not renew the bid protest jurisdiction of the district courts, so the Court of Federal Claims has become the exclusive judicial forum for bid protest cases.

including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." *Id.* § 1491(b)(2).

## II.   Standing

In order for this Court to exercise its jurisdiction in a post-award bid protest case, ADRA requires the plaintiff to demonstrate that it is an "interested party." 28 U.S.C. § 1491(b)(1). The plaintiff's status as an "interested party" is an element of standing, a "threshold requirement in every federal action." *Sicom Sys. Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 975 (Fed. Cir. 2005). Although ADRA does not define "interested party," the Federal Circuit has held that the term should be given the same meaning in the ADRA context as it has in the Competition in Contracting Act: "an actual . . . bidder . . . whose direct economic interest would be affected by the award of the contract. . . ." *American Fed'n of Gov't Employees, AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (*quoting* 31 U.S.C. § 3551(2)(A)). Additionally, "prejudice (or injury) is a necessary element of standing." *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002). To show prejudice, the plaintiff must demonstrate that "that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (*quoting Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)). Thus, to demonstrate standing in this case, HWA must show both that it was an actual bidder and that it had a substantial likelihood of receiving the contract award in the absence of FPS's alleged errors.

HWA certainly was an "actual bidder," in that it submitted a timely proposal in response to RFQ 62949. Therefore, to determine whether HWA has shown sufficient potential prejudice to have standing, this Court must decide whether, assuming all of HWA's allegations regarding FPS's errors in evaluating bids are true, there is a substantial likelihood that HWA would have been awarded the contract.

HWA has alleged three separate types of errors on FPS's part: (1) unequal treatment of its proposal and WSI's proposal in several areas related to evaluation of the technical capability factor, (2) arbitrary and capricious evaluation of its proposal relating to the evaluation of the technical capability and past performance factors, and (3) arbitrarily improper use or weighting of the socioeconomic factor in making the ultimate award decision. Were HWA's allegations correct regarding the technical capability factor, it might be that the proper evaluation of this factor would have left both HWA and WSI with a "very good" rating. Further, were HWA able to prove its allegations regarding the past performance factor, it might be the case that FPS's evaluation of this factor should have given HWA a rating equal to the "outstanding" rating given to WSI. If both of these errors are presumed to have occurred, it follows that HWA's proposal would have (1) tied WSI's proposal on the technical capability factor, (2) tied WSI's proposal on the past performance factor, (3) lost to WSI's proposal on the price factor, and (4) beaten WSI's proposal on the socioeconomic factor. Thus, if HWA established that FPS should have given more weight to its "excellent" rating on the socioeconomic factor, a proper, heavier weighting of

this factor could have resulted in FPS awarding the contract to HWA.  Given this state of affairs, there is a substantial likelihood that, but for FPS's alleged errors, HWA would have been awarded the contract, and HWA therefore has standing to pursue its claim in this Court.

## III.    <u>Standard of Review</u>

Pursuant to the Tucker Act, this Court reviews the challenged agency action under the Administrative Procedure Act ("APA") standards set forth in 5 U.S.C. § 706.  28 U.S.C. § 1491(b)(4); *see also Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004) ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A) . . . .").  Under the APA standards, an agency action will be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or if it is "without observance of procedure required by law."  *Id.* § 706(2)(D).  In other words, "a bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).

"The arbitrary and capricious standard . . . is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors."  *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000).  If an award is challenged on the ground that the procurement official's decision lacked a rational basis, the Court must determine whether the agency provided a "coherent and reasonable explanation of its exercise of discretion," *Impresa Construzioni*, 238 F.3d at 1333 (quoting *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)), and plaintiff "bears the 'heavy burden' of demonstrating that the award 'had no rational basis.'"  *Id.* (quoting *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 456 (D.C. Cir. 1994)).  Where, as here, plaintiff challenges the solicitation on the ground that it was in violation of regulation or procedure, plaintiff must show a "clear and prejudicial violation of applicable statutes or regulations."  *Id.* (quoting *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).  In making its determination, the Court "is not empowered to substitute its judgment for that of the agency."  *Emerald Coast Finest Produce Co., Inc. v. United States*, 75 Fed. Cl. 549, 554 (2007) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)).

In determining whether the agency decision was arbitrary or capricious, the Court evaluates four factors: whether "(1) there was subjective bad faith on the part of the procuring officials; (2) there was a reasonable basis for the procurement decision; (3) the procuring officials abused their discretion; and (4) pertinent statutes or regulations were violated."  *United Int'l Investigative Servs. v. United States,* 41 Fed. Cl. 312, 318 (1998) (citing *Keco Indus., Inc. v. United States*, 203 Ct. Cl. 566, 574, 492 F.2d 1200, 1203 (1974)).  There is, however, no "requirement or implication . . . that each of the factors must be present in order to establish

arbitrary and capricious action by the government." *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed. Cir. 1988).

In order to overturn the agency decision, it is insufficient for HWA merely to establish that FPS's action lacked a rational basis or violated a regulation or procedure. To prevail, HWA also bears the burden of showing "a significant, prejudicial error in the procurement process." *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999). In order to show it was significantly prejudiced, HWA does not have to show that, but for the error, it would have been awarded the contract. *Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed. Cir. 1996). Rather, "[t]o establish 'significant prejudice' [plaintiff] must show that there was a 'substantial chance' it would have received the contract award" absent the challenged agency action. *Bannum*, 404 F.3d at 1353 (citing *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003)). Where HWA demonstrates that the contracting officer's rationale for declining to award to HWA was without a rational basis and that HWA was prejudiced as a result of the decision, "the contracting officer's decision will not stand." *Hawaiian Dredging Constr. Co. v. United States*, 59 Fed. Cl. 305, 316 (2004).

## IV.   HWA's Arguments

HWA makes two types of arguments. First, HWA argues that FPS's evaluation of proposals was flawed because it did not conform to applicable provisions of the Federal Acquisition Regulation ("FAR"), specifically the provision of the FAR requiring equal treatment of proposals during evaluation. Second, HWA argues that certain aspects of FPS's evaluation process do not withstand scrutiny under the "arbitrary and capricious" standard and were therefore irrational and beyond FPS's discretion. The Court treats each of these arguments in turn.

### A.   Unequal Treatment

HWA asserts that its proposal and WSI's proposal were evaluated unequally. Unequal treatment of proposals would constitute a violation of the FAR provision requiring contracting officers to "[e]nsure that contractors receive impartial, fair, and equitable treatment." 48 C.F.R. § 1.602-2. "[T]he issuance of a competitive solicitation which generates responsive offers gives rise to an implied contract of fair dealing," *Hunt Bldg. Co. v. United States*, 61 Fed. Cl. 243, 273 (2004), and this requires that the contracting agency "equal[ly] and impartial[ly] evaluat[e] . . . all proposals." *Hamilton Sundstrand Power Sys. v. United States*, 75 Fed. Cl. 512, 516 (2007). Both this Court and the Government Accountability Office ("GAO") have held that this obligation can be satisfied only when proposals are evaluated "evenhandedly against common requirements and evaluation criteria." *Id.* (*quoting Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 383 (2003); *citing Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560, 569 (2000); *Incident Catering Servs., LLC*, B-296435.2, 2005 WL 3193685 (Sept. 7, 2005); *U.S. Prop. Mgmt. Serv. Corp.*, B-278727, 1998 WL 126845 (Mar. 6, 1998)).

HWA presents two separate assertions of unequal treatment.  First, it argues that FPS unequally evaluated its proposal and WSI's proposal with respect to their proposed Corporate Security Officers.  Second, HWA argues that FPS unequally evaluated HWA's and WSI's proposals as regards the proposed Contract Manager in each proposal.  In both cases, HWA asserts that FPS applied different standards to each proposal in violation of the regulation prohibiting unequal treatment of proposals.

1.  HWA Has Not Shown Unequal Treatment of Its Proposal and WSI's Proposal Regarding the Corporate Security Officer.

In making its unequal-treatment argument, HWA alleges that FPS applied unequal standards to its proposal and WSI's proposal in evaluating the "Corporate Security Officers" that HWA and WSI identified.  Pl.'s Mot. 21.  Specifically, HWA asserts that "[b]oth Plaintiff and Defendant[-Intervenor] proposed to use their respective Corporate Security Officers to oversee their individual quality control plans," and that FPS found this a weakness of HWA's proposal while not finding any such weakness in WSI's proposal.  *Id.*  In this assertion, HWA misinterprets both (1) the nature of the weakness FPS identified in HWA's proposal and (2) the substance of WSI's proposal.

In the Statement of Work for RFQ 62949, as amended, bidders were required to "appoint a senior official to act as the Corporate Security Officer.  The individual will interface with the DHS Security Office through the [contracting officer's technical representative ("COTR")] on all security matters, to include physical, personnel, and protection of all Government information and data. . . ."  AR 127.  HWA did identify a person, Otis Williams, to act as a Corporate Security Officer but stated that he would "work closely with Bruce Washington, COTR, on all areas of quality control."  AR 1004.  In FPS's evaluation of HWA's proposal, FPS noted as a weakness in the proposal's "[q]uality and effectiveness of the allocation of personnel and resources" that "[t]he 'Corporate Security Officer' is identified as working with the COTR on all areas of quality control.  The SOW requires the Corporate Security Officer to serve as a liaison with FPS on all security related matters, not quality control issues."  AR 523.  It therefore appears that FPS believed that HWA's statement that its Corporate Security Officer would work with the COTR on quality control issues demonstrated confusion on HWA's part regarding the RFQ requirements.  The agency's treatment of HWA's confusion over project requirements as a weakness in its proposal was eminently reasonable and rational.[10]

---

[10] At oral argument, counsel for HWA argued that HWA merely intended to indicate that its proposed Corporate Security Officer would be responsible for quality control in addition to the responsibilities set forth in the RFQ.  The Court has found no support for this argument in the administrative record.  At no point in its proposal did HWA acknowledge that the Corporate Security Officer was to interface with the COTR on any topics other than quality control.  Given this, the Court finds that it was reasonable and rational for FPS to believe that HWA was confused about the contract requirements.

Moreover, FPS's refusal to find a similar weakness in WSI's proposal is also reasonable and rational in light of the record.  WSI's proposal identified "Mr. Kevin Conry" as its Corporate Security Officer and stated that he would have "the responsibility and authority to interface with the Security Office through the COTR on all security matters, to include physical, personnel and protection of all Government information. . . ." AR 691.  This description of the Corporate Security Officer's duties is nearly word-for-word identical to the description of the required tasks set out in the RFQ.  AR 127.  Such a description necessarily implies a good understanding by the bidder of the project requirements.  To the extent such an understanding was important to FPS, the Court discerns no irrationality in FPS's finding a proposal with a better understanding of the requirements to have fewer weaknesses than a proposal with less understanding of the requirements.  Put simply, FPS's treatment of HWA's and WSI's proposals with respect to the Corporate Security Officer was not unequal, because FPS applied the same standard to each proposal: whether the bidder demonstrated an understanding of the project requirements.

    2.    <u>HWA Has Not Shown Unequal Treatment of HWA's and WSI's<br>Proposals Regarding the Contract Manager Position.</u>

HWA next alleges unequal treatment in FPS's evaluation of its proposal and WSI's proposal as regards the SOW's requirement to identify a contract manager (identified in the SOW only as "an experienced Manager (CM)" and hereafter referred to in this opinion as "CM") who would "have complete authority to act for the Contractor during the term of the Task Order."  AR 93.  HWA's argument has two components: (1) FPS improperly attributed weaknesses to HWA's proposal because it failed to include a résumé for the CM, even though a résumé was not required and HWA included sufficient narrative information for FPS to evaluate its proposed CM's qualifications, and (2) FPS improperly attributed strengths to WSI's proposal, even though WSI's proposed CM lacked the necessary qualifications for the position.  HWA is incorrect on both counts.

As an initial matter, the parties disagree about whether the solicitation required bidders to submit a résumé for the CM as part of their proposals.  Plaintiff submits that the SOW's requirement that the "Contractor" submit a résumé for its CM should be interpreted to mean that only the successful bidder would be required to submit a résumé and that résumés could not be a requirement of the pre-award proposals.  Pl.'s Response 6.  Defendant substantially agrees.  Def.'s Mot. 25–26.  WSI contends, though, that the SOW's inclusion of a post-award time requirement for résumés of supervisors, AR 94–95, together with the exclusion of a similar time limit for submission of CM résumés suggests that the two requirements should be held to have different temporal elements, and therefore there was a requirement for CM résumés to be submitted with the proposals.  WSI's Mot. 17–18; WSI's Response 5 n.1.  The Court disagrees.  That the SOW failed to specify a particular time when the résumé of the CM had to be submitted leads the Court to conclude, on the record before it, that the CM's résumé was not required to be submitted along with the proposal; rather, the SOW is most reasonably read to state that the awardee would be required to submit a résumé for its CM after award.  That the résumé was not required to be a part of the bidders' proposals, however, does not mean that FPS was precluded

from finding strengths or weaknesses based on the presence or absence of a résumé or equivalent information.

<ol type="a" start="1" style="list-style-type: none;">
<li style="text-align:center;">a)   *FPS Did Not Err in Finding a Weakness in HWA's Proposal for Failure to Document the Qualifications of its Proposed CM.*</li>
</ol>

HWA's first inequality argument is that FPS's assignment of a weakness to HWA's proposal for failure to submit a CM résumé was improper because, although HWA did not attach a résumé, HWA's proposal did include narrative information sufficient to demonstrate that its proposed CM was well-qualified.  The SOW required the CM to have "a minimum of five (5) years of specialized experience," and it further defined "specialized experience" as "includ[ing] project development and implementation from inspection to deployment; expertise in the management and control of funds and resources using complex reporting mechanisms; and demonstrated capability in managing multi-task contracts or subcontracts of various types and complexity."  AR 93.  In addition, the SOW required the CM to "have either completed a four-year course of study leading to a bachelor's degree with a major in any field of study, or have substantial and credible law enforcement, military, or business management experience that demonstrates the individual's capacity to effectively manage a security guard Contract/task order of the size and scope described in the SOW."  *Id.*  The information provided about the CM in HWA's proposal was as follows:

> HWA will recommend Rodney Moore as Contract Manager.  He has the educational credentials and security management experience required and will do an outstanding job as CM.  He is currently Operations Manager for both Manhattan and Brooklyn contracts.  He has excellent communications skills and has detailed knowledge of all locations, post and security requirements in Manhattan and Brooklyn and will incorporate the Bronx and Long Island into his sphere of management.  He is highly regarded by FPS and customers.  (Key Personnel Resume to be supplied upon contract award, as per SOW).

AR 1003.  In response to this information, the evaluation team assigned one weakness to HWA's proposal: "The proposed Contract Manager's ability to meet the requirements is questionable, due to the company not providing any supporting documentation."  AR 524.  In light of this weakness, FPS assigned HWA's proposal a rating of "satisfactory" on the element of the "personnel qualifications" subfactor relating to "[t]he currency, quality, and depth of experience of individual personnel in working on similar projects."  AR 521, 524.  In part based on this determination, FPS assigned HWA's proposal a rating of "satisfactory" on the "personnel qualifications" subfactor, which in turn contributed to a rating of "satisfactory" for the "technical capability" factor.  HWA contends that this weakness and these associated ratings are not supported by the record.

Taking HWA's statements about its proposed CM one at a time, FPS's complaint about a lack of "supporting documentation" appears to be reasonable.  The statement that Mr. Moore "has the educational credentials and security management experience required and will do an

outstanding job as CM," AR 1003, is purely conclusory, leaving the evaluation team with no adequate basis for determining the statement's accuracy.  The same is true of the statement that Mr. Moore "has excellent communications skills and has detailed knowledge of all locations, post and security requirements in Manhattan."  *Id.*  The statement that the proposed CM "has detailed knowledge of all locations, post and security requirements in . . . Brooklyn," *id.*, is irrelevant to FPS's evaluation of a proposal to provide guard services in Manhattan, the Bronx, and Long Island.  Finally, that Mr. Moore "is highly regarded by FPS and customers," *id.*, is also conclusory.

Thus, to provide sufficient information to allow FPS to evaluate its proposed CM's credentials, HWA must rely on the statement that Mr. Moore "is currently Operations Manager for both Manhattan and Brooklyn contracts."  *Id.*  The Court finds that FPS acted rationally in determining that this statement lacked sufficient detail to evaluate Mr. Moore's credentials. First, even presuming that "Operations Manager" in HWA's ongoing contracts is a role similar to that of CM in the contract at issue, the statement that Mr. Moore currently holds the position does not permit FPS to determine how long he has held the position.  Second, it is not clear that the role of "Operations Manager for both Manhattan and Brooklyn contracts" is identical to the role of CM for the Manhattan, Bronx, and Long Island contract, as HWA appears to suggest. Nowhere in its proposal does HWA discuss how the two positions compare.  Third, the description of Mr. Moore's current position does not permit evaluation of his educational or experiential qualifications.  HWA argues, however, that, even in the absence of such discussion in its proposal, FPS was obligated to use whatever information it could gather to determine whether, on the basis of his current position, Mr. Moore had sufficient credentials for the position of CM.  Pl.'s Response 7.  As support for this proposition, HWA cites *Weidlinger Assoc., Inc.*, B-299433.2, 2007 WL 1544206 (Comp. Gen. May 7, 2007).  *Weidlinger* is inapposite.  It holds that an agency is not precluded from considering any relevant information at hand, not that an agency is required to search out such information.  *Id.* at *6.  While the rule in *G. Marine Diesel*, cited in *Weidlinger*, appears to be somewhat stronger, it also appears to be limited to requiring consideration of recent unsatisfactory performance information when older satisfactory past performance information is already available, given its basis in a FAR provision "requir[ing] contracting officers to safeguard the interests of the United States."  *G. Marine Diesel*, B-232619.3, 68 Comp. Gen. 577, 581–82 (Comp. Gen. Aug. 3, 1989) (*citing* 48 C.F.R. § 1.602). While there is undoubtedly a strong argument that requiring contracting officers to take into account reasonably available, current, negative past performance information safeguards the interests of the United States, this Court is unprepared to extend that holding to require contracting officers to undertake research into the qualifications of personnel who are currently carrying out duties under one contract and are proposed to fill what appear to be similar positions on new contracts.[11]  The interests of the United States in having qualified personnel as contract

---

[11] Moreover, requiring contracting officers to conduct this research into the qualifications of incumbent contractors might be seen as giving an unfair benefit to incumbent contractors and thus very well might violate 48 C.F.R. § 1.602-2, the FAR provision requiring that proposals be evaluated equally—the very provision on which HWA has based its unequal treatment argument.

managers are sufficiently well protected by allowing contracting officers to evaluate proposed contract managers' qualifications based on whatever information the bidder sees fit to provide. Given the lack of detail HWA provided regarding the credentials of its proposed contract manager, the Court finds that FPS acted reasonably and rationally in assigning HWA's proposal a weakness in this area.

> b)   *FPS Did Not Err by Finding WSI's Proposed CM Qualified and by Assigning a Corresponding Strength to WSI's Proposal.*

HWA next argues that FPS erred by finding that the information WSI provided regarding its proposed contract manager warranted assigning WSI's proposal a strength that contributed to WSI's "excellent" rating on the "technical capability" factor.  In response to WSI's inclusion of a résumé for its proposed CM, AR 711–13, FPS assigned WSI's proposal a strength in the "personnel qualifictions" subfactor: "The resume for the contract manager is provided, referencing his experience as a sergeant–special forces unit–NYPD counter terrorism division." As an initial matter, it was reasonable for FPS to attribute more strength to WSI's proposal than to HWA's proposal merely because WSI submitted a significant amount of information—covering three pages—regarding its proposed CM's background, rather than the barebones paragraph provided by HWA.  Plaintiff argues, though, that the mere presence of a résumé for the proposed CM should not be enough to award WSI's proposal a strength when the résumé demonstrates that the proposed CM does not meet the qualifications for the position. Pl.'s Mot. 22; Pl.'s Response 7.  Specifically, HWA argues that WSI's attached résumé fails to demonstrate that its proposed CM "has . . . contract or subcontract management experience." Pl.'s Mot. 22.  HWA's argument fails, however, because "contract or subcontract management experience" was not a requirement for the CM; rather, "demonstrated capability in managing multi-task Contracts or subcontracts of various types and complexity" was only one of three types of "specialized experience," any of which could qualify a person to hold the position of CM.  AR 93.  Among other types of "specialized experience" that would also qualify were "expertise in the management and control of funds and resources using complex reporting mechanisms" and "project development and implementation from inspection to deployment."[12] *Id.*  Given that WSI's proposed CM, David Halpern, was a supervisor in the New York Police Department for eight years, it was reasonable for FPS to find that he had these types of specialized experience.  During his work with the NYPD, Mr. Halpern supervised the Police Area One Crime Analysis Unit for six years and supervised the Special Projects Unit of the Counter Terrorism Division for an additional two years.  AR 711–13.  In addition to these supervisory roles, in which FPS was reasonably entitled to conclude that Mr. Halpern was responsible for management and control of funds, Mr. Halpern also undertook significant project management work, including the "creation . . . of a soft target threat matrix for some 2500

---

[12] During oral argument, counsel for HWA stated that any one of these three types of "specialized experience" would suffice to qualify a person for the position of CM, and that the RFQ should not be interpreted as requiring all three.  The Court agrees that the language of the solicitation supports this interpretation.  AR 93.

locations (ranging from icons and monuments to private businesses and real estate) within the confines of New York City."  AR 712.

The Court will not substitute its judgment for the judgment of FPS's technical evaluation personnel.  The Court can only disturb the agency's exercise of its discretion when the decision "is shown to be without a reasonable basis or inconsistent with the stated evaluation criteria." *Cube Corp. v. United States*, 46 Fed. Cl. 368, 386, 374 (2000).  Here, FPS's assignment of strengths and weaknesses to the proposals' suggested contract managers had a reasonable basis and was entirely consistent with the evaluation criteria.  Given that FPS's evaluation of the information provided in each proposal regarding the proposed contract managers was rational, it only remains to be determined whether the proposals were evaluated unequally.  The Court finds that no unequal treatment took place in this area.  FPS found strengths in WSI's proposal based on a reasonable conclusion that WSI provided information about its proposed CM that showed he was qualified to hold the position.  Similarly, FPS found weaknesses in HWA's proposal based on the proposal's lack of information that would allow FPS to determine whether the proposed CM was qualified.  In both cases, FPS applied the same standard: does the proposal include information sufficient to evaluate the proposed CM's credentials, and if so, does the proposed CM possess the required qualifications?  The rational application of a consistent standard to different proposals cannot be considered unequal treatment.

## B.  Rational Basis for FPS's Evaluation

HWA also argues that certain aspects of FPS's award decision lacked a rational basis and were therefore an abuse of the agency's discretion.  Although contracting agencies have wide discretion in evaluating proposals, that discretion is not without bound.  Instead, the exercise of the agency's discretion "must be reasonable" and is "[b]ound by the arbitrary and capricious standard of review."  *Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560, 567 (2000).  As pointed out above, this standard "is highly deferential" and "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors."  *Supra* p. 13 (*quoting Advanced Data Concepts*, 216 F.3d at 1058).  The award decision in this case was based on a best-value decision, which grants the agency even greater discretion than it would otherwise have.  *Galen Med. Assoc., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004).  This Court "examine[s] the agency's evaluation to ensure that it was reasonable and consistent with the evaluation criteria."  *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996).  Finally, in the event this Court finds that the agency's evaluation departed from the evaluation criteria set out in the solicitation or that the agency's evaluation was unreasonable or irrational, the plaintiff must also show that, but for the error in the agency's evaluation, there was a substantial chance the plaintiff would have received the contract award.  *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999).

Here, HWA asserts that FPS's award decision lacked a rational basis in three separate areas.  First, HWA argues that FPS's evaluation of HWA's and WSI's personnel qualifications was flawed because (1) WSI's proposed contract manager was underqualified for the position,

(2) FPS unfairly downgraded HWA's proposal because HWA did not submit a résumé for its proposed contract manager, and (3) FPS unfairly downgraded HWA's proposal because HWA did not submit résumés for other key personnel.  Second, HWA asserts that FPS improperly weighted or ignored the results of its evaluation of the socioeconomic factor in making its final award decision.  Finally, HWA argues that FPS's evaluation of HWA's past performance lacked a rational basis.[13]

> 1.       HWA Has Shown a Lack of a Rational Basis in FPS's Evaluation of HWA's Personnel Qualifications, but FPS's Error Was Not Prejudicial.

HWA first argues that FPS's evaluation of proposals was irrational because FPS assigned weaknesses to HWA's proposal and strengths to WSI's proposal in the area of personnel qualifications.  HWA contends that these strengths and weaknesses are not supported by the record.  In particular, HWA takes issue with FPS's finding that HWA provided insufficient information to evaluate its proposed CM's qualifications and with FPS's finding that the information provided by WSI showed that its proposed CM was well-qualified.  To the contrary, HWA argues that its proposal provided more than adequate information to demonstrate its proposed CM's excellent qualifications and that WSI's proposal, while containing significant information about its proposed CM, showed him to be underqualified for the position for which he was being recommended.  The Court has already dealt with these allegations above in its discussion of HWA's claim of unequal treatment regarding the contract manager position, and the Court will not repeat its analysis here.  *See supra* p. 16 *et seq.*

---

[13] In addition to these arguments about the factors that went into FPS's award decision, counsel for HWA took issue at oral argument with FPS's statement that "[g]iven the critical nature of this requirement, it is not in the Government's best interests to award to HWA," contending that this statement presumes an inability on the part of HWA to perform the contract not demonstrated in the record.  *See* AR 547.  The Court disagrees with HWA's interpretation of this language.  First, the statement occurs in a document titled "Award Evaluation Summary," AR 530, and specifically in a paragraph explaining why, even though WSI did not receive a good "socioeconomic factor" score, it was selected over bidders receiving better scores.  AR 546–47.  Given these facts, the Court finds that the statement that "it is not in the Government's best interests to award to HWA" was not meant as a strike against HWA's proposal, but rather as a summary of why the contracting officer decided that the best value to the Government was provided by WSI's proposal rather than HWA's.  Further, FPS's statement that the contract in question was for "critical" work is entirely apt.  The New York-area federal buildings are prime terror targets, and in selecting guards for those buildings, FPS is, for that additional reason, entitled to substantial discretion in attempting to select the vendor most likely to do an effective job protecting them.  *See also* 28 U.S.C. § 1491(b)(3) (providing that in exercising bid protest jurisdiction, courts "shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action").

a)      *FPS Erred by Assigning HWA's Proposal Weaknesses Based on the Absence of Résumés for On-Site Supervisors.*

HWA also argues that FPS's evaluation of the personnel qualifications subfactor was irrational because it ignores HWA's identification of eight individuals, in addition to the proposed CM, proposed to have particular roles in contract performance, in contrast to WSI's identification of only one individual beyond its proposed CM. Pl.'s Mot. 24–25; Pl.'s Response 8. Plaintiff notes particularly that six of its identified individuals, in addition to the proposed CM, "are currently working on the predecessor contract." Pl.'s Response 8. Given that this information was provided in HWA's proposal, HWA takes issue with FPS's assignment of weaknesses to the elements of the personnel qualifications subfactor relating to "[t]he currency, quality, and depth of experience of individual personnel in working on similar projects" and the "[q]uality and depth of education and experience on other projects which may not be similar enough to include in response to [the 'similar projects' element]." AR 524. FPS assigned weaknesses to both of these elements because HWA "did not provide resumes (work experience, work history, education, training, etc.) for key personnel as required in the SOW." *Id.* The SOW had defined "key personnel" to include the CM and on-site supervisors. AR 93–96. Thus, HWA was assigned weaknesses in the personnel qualifications subfactor because it failed to include résumés (or equivalent narrative information) about its proposed contract manager and on-site supervisors. As discussed above, this finding was rational with respect to the contract manager.

But was FPS's assignment of weaknesses to HWA's proposal rational to the extent that it depended upon HWA's failure to submit résumés for its on-site supervisors? On the evidence before it, the Court finds that HWA was not required to submit either résumés or equivalent information in narrative form for its proposed on-site supervisors. The SOW did require that the winning bidder submit this information, but not until after contract award. Specifically, the SOW called for the contractor to "provide the name(s), telephone number, pager number (if any), cellular phone number (if any), facsimile number, e-mail address (if any), and office address of the Area Supervisor(s) by the date of the first meeting after award of the Contract/task order. Additionally, the Contractor shall submit a Key Personnel Resume clearly detailing the individual's qualifications to the CO or COTR by the time of the first meeting after task order award." AR 94–95. Given these instructions, FPS could not, consistent with the RFQ, require bidders to submit information about on-site supervisors during the bidding process, and FPS therefore could not attribute weaknesses to proposals because of a failure to submit such information. The key question therefore becomes to what extent HWA's weaknesses on each element of the personnel qualifications subfactor were due to its failure to provide adequate information about its proposed CM, and to what extent they are due to HWA's failure to submit similar information regarding its proposed on-site supervisors.

In particular, HWA's rating of "satisfactory" on the first element, "[t]he currency, quality, and depth of experience of individual personnel in working on similar projects," was based on two assigned weaknesses. AR 524. One of the assigned weaknesses, "[t]he proposed Contract Manager's ability to meet the requirements is questionable, due to the company not providing

22

any supporting documentation," certainly relates to the lack of information about the proposed CM. But the other assigned weakness, "[t]he contractor did not provide resumes (work experience, work history, education, training, etc.) for key personnel as required in the SOW," could encompass the lack of résumés (or similar narrative information) for both the CM and the on-site supervisors. Because one weakness was already assigned for the lack of a CM résumé, the second weakness thus makes sense only as a weakness assigned for the lack of on-site supervisor résumés. As discussed above, this is improper. Thus, FPS erred in assigning HWA's proposal this weakness. Because the same language—evidencing the same misconception that on-site supervisor résumés were required—appears as a weakness relating to the second element of the "personnel qualifications" subfactor, the Court finds that the assignment of this weakness to that element was also in error in that it was inconsistent with the evaluation criteria.

> b)   *FPS's Error in Assigning Weaknesses to HWA's Proposal for the Absence of Résumés for On-Site Supervisors Was Not Prejudicial.*

In light of the other findings discussed in this Opinion and Order, the Court finds that, even though some of the weaknesses assigned to HWA's proposal should not have been assigned, HWA was not prejudiced by this error in the sense that, absent the error, HWA would have had a significant chance of being awarded the contract over WSI. If the weaknesses relating to non-contract manager key personnel résumés are removed from the personnel qualifications subfactor, the evaluation of the subfactor would be as follows:

- On the first element, there would still be a weakness relating to HWA's failure to submit adequate information regarding its proposed contract manager. Given that this element was evaluated as "satisfactory" when it had two weaknesses, AR 521, and given that it still would have one valid weakness, the evaluation of this factor could be at best "very good" when this error is corrected.
- On the second element, there would be no strengths or weaknesses. In the absence of any identified strengths, the Court is reluctant to find that HWA's proposal should be rated as "excellent" in this area, but the Court will assume that is the case for the purposes of this proceeding.
- The third element would not change and would still be rated as "very good." AR 521.

The personnel qualifications subfactor would then have three elements, one with a rating of "excellent" and two with ratings of "very good." The overall rating of the personnel qualifications subfactor would thus be "very good." Even with this change, though, the overall evaluation of the technical capability factor would not change. Rather than having three subfactors, each rated "satisfactory," the evaluation would show two subfactors rated "satisfactory" and one subfactor rated "very good." The overall rating for the factor would remain "satisfactory." Thus, HWA's rating on this factor would still be two steps below the

"excellent" rating that WSI's proposal received.[14]   WSI would still prevail over HWA on the technical capability, past performance, and price factors, and FPS would still be required by the terms of the solicitation to award the contract to WSI.[15]

> 2.   HWA Has Not Shown a Lack of a Rational Basis in FPS's Weighting or Use of the Socioeconomic Factor in Selecting WSI's Proposal over HWA's Proposal.

HWA presents two arguments with respect to FPS's use of the socioeconomic factor. While HWA believes (and neither defendant nor defendant-intervenor contests) that FPS's assignment of an "excellent" rating to HWA and a "poor" rating to WSI on this factor was correct, HWA argues first that the weight given to the socioeconomic factor in the award evaluation was less than was required by the RFQ and its amendments.  Pl.'s Mot. 26.  Second, HWA asserts that FPS "simply ignored [the socioeconomic] factor in its Source Selection Decision."  Pl.'s Mot. 27.  HWA is incorrect on both counts.

As an initial matter, as discussed above, HWA is correct that one reason for overturning an agency award decision is that the agency's evaluation of proposals was done in a manner inconsistent with the evaluation criteria discussed in a solicitation.  *Supra* p. 20 (*quoting E.W. Bliss*, 77 F.3d at 449); *see also, e.g., JWK Int'l Co. v. United States*, 52 Fed. Cl. 650, 659 (2002) (listing "whether the evaluation was . . . consistent with the stated evaluation criteria" as one basis for review of agency decisions); *cf. United Enterprise & Assoc. v. United States*, 70 Fed. Cl. 1, 26 (2006) (stating that GAO review should include "examin[ing] the record to ensure that the evaluation was . . . in accordance with stated evaluation criteria").  On the record before it, though, the Court is not convinced that FPS's evaluation in this case was inconsistent with the evaluation criteria listed in the RFQ and its amendments.

---

[14] Even if the improvement of just one subfactor (personnel qualifications) from "satisfactory" to "very good" somehow led to the conclusion that the technical capability factor should be changed from "satisfactory" to "very good"—a very tenuous conclusion, given that the other two subfactors would both remain "satisfactory" in this analysis—HWA's proposal would still remain one step behind WSI's proposal, and WSI would still therefore prevail on the technical capability factor.

[15] At oral argument, counsel for HWA argued that FPS also erred in evaluating WSI's proposal because WSI was given a strength ("The listed past and present performances appear to address this element") for the second element of the "personnel qualifications" subfactor, even though this strength appears to rely on WSI's corporate experience (as opposed to the individual experience of its proposed personnel) in contravention of the element's wording ("The currency, quality, and depth of experience of individual personnel . . .").  *See* AR 515.  HWA's argument fails because the quoted language about "individual personnel," while present in the first element of the "personnel qualifications" subfactor, is not present in the second element, for which the strength in question was awarded.  AR 515.

In evaluating the proposals, FPS discussed the socioeconomic factor extensively.  Each proposal was evaluated to determine whether the contractor and/or any proposed subcontractors were General Services Administration small businesses.  AR 544–47.  In addition, in making the final award decision, the contracting officer noted WSI's "poor" rating on the socioeconomic factor but still noted that "WSI offers the best value to the Government" in light of WSI's high ratings on the other three factors.  AR 548.  Given the extensive discussion of the socioeconomic factor during the evaluation and award decision, it is clear that the record does not support HWA's argument that the socioeconomic factor was "simply ignored" by FPS.

Equally incorrect are HWA's allegations that the socioeconomic factor was weighted less during the evaluation of the proposals than it should have been in accordance with the RFQ and its amendments.  Part and parcel of this argument is HWA's insistence that the RFQ requires that the socioeconomic factor be considered "the single most important factor."  Pl.'s Mot. 26–27.  HWA advances two arguments for its theory: (1) the RFQ stated that "[t]he socio-economic factor was equal in importance to all of the other factors combined," and (2) any interpretation of the solicitation criteria other than one that makes the socioeconomic factor the most important "necessarily renders the solicitation['s] stated evaluation weighting formula meaningless."  Pl.'s Mot. 26–27.  Plaintiff's first argument is easily disposed of.  While the original RFQ did state that "Socio-Economic Factors are weighted equal to Price, Technical Capability, and Past Performance,"[16] AR 273, this language was removed from the solicitation by the third amendment, which provided only that "Technical Capability, Past Performance, and Price are in descending order of importance and, when combined, are more important than Socio-Economic Factors."  On the record before it, the Court concludes that this new language means what it says: that the technical capability factor is more important than the past performance factor, that the past performance factor is more important than price, and that the combination of technical capability, past performance, and price is more important than the socioeconomic factor.  While

---

[16] Although the most likely proper interpretation of this original RFQ language is that the socioeconomic factor is equal in importance to the combination of the other factors, it is also possible that this language was meant to be interpreted as stating that the socioeconomic factor is equal in importance to *each of* the other three factors.  For example, if each of the four factors (including the socioeconomic factor) were worth 25% of the overall score, all statements regarding factor weighting in the original RFQ would be true.  Technical capability and past performance would be of equal importance (each worth 25%), as required by the original RFQ.  AR 273.  The combination of technical capability and past performance (a total of 50%) would be more important than price (at 25%).  *Id.*  The socioeconomic factor would be "weighted equal to [each of] Price, Technical Capability, and Past Performance."  *Id.*  Under this interpretation, the socioeconomic factor would not be "the single most important factor," as HWA insists, but would instead be just as important—or unimportant—as each of the other factors.  If this interpretation were correct, and the Court cannot rule that out, then not only could the socioeconomic factor be something other than the most important factor under the amendments to the RFQ, it could also be the case that the socioeconomic factor was never intended to be the most important factor, even under the original RFQ language.

treating the socioeconomic factor as the single most important factor is consistent with this weighting scheme, it is not mandated by this language.

For example, a weighting of factors that gave technical capability 30 percent, past performance 27 percent, price 24 percent, and the socioeconomic factor 19 percent would fit the amended RFQ's requirements that (1) the technical capability factor be more important than the past performance factor, (2) the past performance factor be more important than price, and (3) the combination of technical capability, past performance, and price be more important than the socioeconomic factor.  In such a case, the socioeconomic factor would be the least important of the four factors.  A weighting giving technical capability 28 percent, past performance 25 percent, price 22 percent, and the socioeconomic factor 25 percent would also meet the RFQ's stated requirements, and the socioeconomic factor would be neither the most important nor the least important factor.  Although these examples do not permit the Court to determine precisely what weight, if any, the RFQ and its amendments require the four factors to be given,[17] the Court can say that they clearly demonstrate that, contrary to plaintiff's argument, the RFQ (as amended) does not require that the socioeconomic factor be the single most important factor.

HWA also argues, though, that any interpretation of the solicitation criteria other than one that makes the socioeconomic factor the most important "necessarily renders the solicitation['s] stated evaluation weighting formula meaningless," and that this is not allowed under applicable Federal Circuit case law that upholds the principle that "an interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless."  Pl.'s Mot. 27 (*quoting Fortec Constructors v. United States*, 760 F.2d 1288, 1292 (Fed. Cir. 1985)).  The Court is unpersuaded that this principle applies here.  In *Fortec Constructors*, the plaintiff argued for a contract interpretation that would have directly contradicted an express provision of the contract in question, and the Court refused to accept the proffered interpretation because it would have rendered the actual language of the contract meaningless.  760 F.2d at 1292.  In the case at bar, it appears that HWA is arguing that any interpretation of the statement "Technical Capability, Past Performance, and Price are in descending order of importance and when combined, are more important than Socio-Economic Factors," AR 60, other than one in which the socioeconomic factor is given primary importance is wholly devoid of meaning.  That is untrue.  As discussed above, various interpretations of this language are possible, including interpretations in which the socioeconomic factor is the most important factor, the least important factor, or somewhere in between.  But all of these interpretations are still subject to the requirement, set forth in the RFQ amendment, that the socioeconomic factor be less important than all the other factors put together.  Thus, the language

---

[17] Indeed, as indicated earlier, the amendments to the RFQ appear to rule out any comprehensive scheme of precise factor weights, stating that "[o]nly the 'socioeconomic factors' of the request for quotation shall be evaluated based on percentages. . . . All other 'Evaluation Factors' shall be evaluated based completely on adjectival ratings."  AR 62.  In response to a question about the precise factor weights to be used, FPS responded with this same language.  AR 499.

of the RFQ amendment has meaning, regardless of the importance of the socioeconomic factor relative to the other individual factors.

Given that the RFQ, as amended, required FPS to give more weight to the combination of technical capability, past performance, and price than to the socioeconomic factor by itself, it remains for the Court to determine whether FPS in fact followed this instruction in making its award decision.  The Court finds that FPS applied factor weights consistent with the requirements of the amended RFQ.  In making its award decision, FPS noted that WSI's proposal received ratings higher than those received by HWA in technical capability, past performance, and price.  AR 543.  If the combination of these three factors was treated as more important than the socioeconomic factor itself, then an award to WSI was mandated by the evaluation criteria.  Thus, FPS's award to WSI demonstrates that FPS acted in accordance with the evaluation criteria established in the third amendment to the RFQ.

> 3.  <u>HWA Has Not Shown a Lack of a Rational Basis in FPS's Evaluation of the Past Performance Factor in HWA's Proposal.</u>

HWA's final argument that FPS's evaluation and award decision lacked a rational basis relates to FPS's assignment of a rating of "excellent" to HWA's proposal as it related to past performance.[18]  HWA argues that it instead should have received a rating of "outstanding" because its performance as the provider of guard services in Manhattan, where it was the incumbent contractor for approximately 80 percent of the work to be awarded under RFQ 62949, had been rated by FPS as [* * *], the highest rating available on the questionnaire that FPS completed.  Both in its briefs and at oral argument, HWA argued that, given its achievement of the highest rating available for its past performance of services identical to those representing a significant portion of the work to be performed under the RFQ, any past performance rating in FPS's evaluation other than the highest rating possible must be without any rational basis and must be due to FPS's ignoring HWA's documented past performance.

The past performance ratings available in FPS's evaluation of the proposals were "outstanding," "excellent," "good," "fair," "poor," "unsatisfactory," and "not applicable."  AR 538.  Setting aside the "not applicable" rating, which would be used in the event the agency was "[u]nable to provide a score," there were three ratings—good, excellent, and outstanding—for past performance at or above the level expected of a winning bidder, and there were three ratings—fair, poor, and unacceptable—for past performance below the level expected.  *Id.* Specifically, the rating of "excellent" was to be awarded where "[t]he contractor has substantially exceeded the contract performance requirements," and the rating of "outstanding" was for situations in which "[t]he contractor has demonstrated an outstanding performance level that was significantly in excess of anticipated achievements and is commendable as an example to others."  *Id.*  In addition, "[i]t [was] expected that th[e outstanding] rating [would] be used in

---

[18] At oral argument, counsel for HWA conceded that HWA does not question the past performance rating of "outstanding" given to WSI's proposal.

those rare circumstances where contractor performance clearly exceed[ed] the performance levels described as 'excellent.'" *Id.*

HWA's past performance rating was assigned based on four evaluations of its performance. HWA submitted two completed evaluation questionnaires as part of its proposal, one for its work for FPS in Manhattan between 2000 and 2005, and one for its work for FPS in Brooklyn between 2003 and 2005. AR 1056–59. On both of these questionnaires, FPS rated HWA's performance as [* * *] in every category; the available ratings were limited to [* * *], [* * *], and [* * *]. *Id.* In addition, HWA identified two additional contracts for which it suggested FPS obtain information regarding its past performance, one for the National Archives and Records Administration ("NARA") at the Harry S. Truman Library in Independence, Missouri, and one for the Federal Emergency Management Agency ("FEMA") in Bothell, Washington. AR 1061–62. HWA did not submit completed questionnaires for these contracts, but FPS contacted HWA's references and determined that "[o]n a $917,964 [per year] effort, NARA rated HWA as [* * *] throughout," and that "[o]n a $392,282 effort, FEMA rated HWA as [* * *] in 'the ability to alert Government of unforeseen costs before they occur.'" AR 540.

HWA's first argument is that FPS, in conducting its evaluation, "ignored the obvious fact that Plaintiff was the incumbent in 80% of the work (90% if its proposed subcontractor was counted) and had received the highest possible past performance evaluation score from the very agency making the award." Pl.'s Mot. 28; Pl.'s Response 11. This argument is easily disposed of, because the Award Evaluation Summary document reflects FPS's consideration of HWA's performance on the Manhattan contract. Specifically, after laying out the past performance information FPS received from NARA and FEMA, FPS goes on to note the past performance information it had regarding HWA's work for FPS: "On a $12,000,000 [per year] effort, the Department of Homeland Security rated HWA as [* * *]. On a $3,500,000 [per year] effort, the Department of Homeland Security also rated HWA as [* * *]." AR 540. Thus, FPS did not ignore HWA's performance on the Manhattan contract.

HWA goes on to argue that a later statement in the Award Evaluation Summary reflects ignorance of HWA's Manhattan work. Specifically, the document states

> HWA past performance, although rated "Excellent," its references [sic] were for requirements significantly smaller in scope and not relevant to the size of this requirement.

AR 546–47. This statement comes in the context of explaining FPS's decision to award to WSI instead of HWA. The paragraph from which this quotation is taken also mentions HWA's price ("$[* * *] higher than WSI['s price]") and HWA's technical capability rating ("included several weaknesses" and "the technical evaluation team found the HWA quote lacked sufficient information to determine its eligibility"). *Id.* Although HWA focuses on this statement's failure to mention the Manhattan contract as evidence that FPS failed to consider the Manhattan

contract, the discussion of HWA's past performance elsewhere in the document (and discussed above) shows that FPS did in fact consider HWA's work providing guard services in Manhattan. In addition, the statement at AR 546–47 regarding HWA's past performance is entirely rational and reasonable.  The independent government cost estimate of the work to be performed under RFQ 62949 was over $[* * *] million, or $[* * *] million per year.  HWA's own price quotation was for $[* * *] million, or approximately $[* * *] million per year.  The past performance information HWA supplied was for contracts of $400,000 per year, $900,000 per year, $3.5 million per year, and $12 million per year.  Three of these amounts are clearly "significantly smaller" than the
$[* * *] million or $[* * *] million per year involved in the contract at issue.[19]  Although reasonable minds could differ as to whether there is a "significant" difference between HWA's $12 million per year effort in Manhattan and the planned $[* * *] million effort for the Manhattan, Bronx, and Long Island federal buildings, the Court cannot say that finding this difference of $[* * *] million per year to be significant is unreasonable or irrational.

Finally, HWA's argument demonstrates confusion on its part regarding the definitions of the available past performance ratings.  HWA insists that, because it received "the highest possible past performance evaluation score" regarding its Manhattan work, there can be no basis for giving its current proposal any past performance rating other than the highest rating available. As the government points out, "HWA apparently believes that its proposal is entitled to a presumption of perfection."  Def.'s Mot. 27.  If HWA does believe this, it is mistaken.  FPS is entitled to use its judgment and discretion to determine how to assign past performance ratings, and it is an acceptable practice to assume a rating in the middle of the scale is warranted, and then to move proposals to a higher or lower rating depending on the information gleaned from past performance questionnaires.  *See Beta Analytics Int'l, Inc. v. United States*, 67 Fed. Cl. 384, 400 (2005) (holding that assigning a perfect score to every proposal that meets the SOW requirements "would actually increase the chance of arbitrary awards—since contracting officers would often be picking between offerors who are exactly even in evaluated quality").  In evaluating HWA's past performance, FPS was faced with the task of translating the [* * *] ratings achieved by HWA on a 3-rating scale to ratings on FPS's current 6-rating scale.  In other words, FPS needed to map the [* * *],[* * *], and [* * *] ratings to a scale on which outstanding, excellent, good, fair, poor, and unacceptable ratings were available.  The Court sees nothing irrational about treating a rating of [* * *] on the 3-rating scale as equivalent to a rating of "excellent" on the 6-rating scale.  The rating of "excellent" was to be awarded where "[t]he contractor has substantially exceeded the contract performance requirements," AR 538, and a rating of [* * *] on the FPS questionnaire was one step above "acceptable" and therefore represented a level of performance substantially in excess of that required to meet expectations. Given the description of the "excellent" rating in this evaluation, it appears to map very well to

---

[19] At oral argument, counsel for HWA conceded that the NARA and FEMA contracts were significantly smaller than the contract anticipated under the RFQ and that FPS therefore acted reasonably in regarding these contracts as irrelevant.  The Court agrees.

the [* * *] rating on the FPS questionnaire.  It certainly is not unreasonable or irrational to equate the two.

FPS might reasonably have allowed the rating of [* * *] on the 3-rating scale to map to *either* "excellent" or "outstanding" on the 6-rating scale, depending on the other past performance information available.  In this case, that other information might reasonably have supported giving HWA the lower of these two ratings, because the other information rated HWA generally as [* * *] or [* * *], rather than as "outstanding," on contracts much smaller in scope than the contract to be awarded under RFQ 62949.  AR 540.  Given that FPS's actions in assigning HWA's proposal a rating of "excellent" for past performance were rational, it is not open to the Court to substitute its own judgment and mandate a rating of "outstanding."  *Dismas Charities, Inc. v. United States*, 61 Fed. Cl. 191, 207 (2004).

The Court is mindful that FPS was bound to compare the individual bidders' past performance to the descriptions of the various available adjectival ratings and not to one another, but the Court believes that a direct comparison of HWA's and WSI's past performance information demonstrates FPS's reasonable evaluation of the past performance factor.  The duration of the contracts is similar in both cases, with most of the evaluated contracts having durations of over four years.  WSI's past performance demonstrates a record of performance stretching back to 1999, while HWA's record reaches to 2000, an insignificant difference.  But in contract size, measured either in total dollars or in dollars per year, WSI's contracts are significantly larger.  The smallest of WSI's contracts (both in total value and yearly value) was still worth almost $4.3 million per year, larger than any of HWA's contracts except the Manhattan guard services contract.  WSI's other contracts were worth between 5.8 and 17.4 times this amount.  Thus, while HWA's performance was excellent, it came on contracts that were significantly smaller than those of WSI.  Even if WSI's performance had been regarded as objectively identical in quality, FPS was entitled to take into account the size of the contracts for which past performance was evaluated, because, as FPS recognized, the size of the contract helps indicate whether the level of performance established on that contract is likely to carry over to the work under consideration.  Given the large disparity in the size of the contracts HWA and WSI have performed, FPS did not act irrationally or unreasonably in giving the different past performance ratings that it did to the two bidders.

## *CONCLUSION*

For the reasons stated above, the Court concludes as follows.  First, the evidence in the administrative record does not show any unequal treatment of WSI's and HWA's proposals by FPS with respect to their proposed Corporate Security Officers.  Second, the evidence in the administrative record fails to show any unequal treatment of the proposals by FPS with respect to the proposed Contract Managers.  Third, the evidence establishes that FPS irrationally evaluated the personnel qualifications subfactor in HWA's proposal, but this error was not prejudicial, because, even in the absence of the error, HWA would still not have had a substantial chance of being awarded the contract.  Fourth, the evidence does not show that FPS abused its discretion in

applying the socioeconomic factor to make its final award decision.  Finally, the evidence does not establish that FPS acted irrationally or unreasonably in evaluating HWA's past performance.

Accordingly, the Court ORDERS that HWA's motion for judgment on the administrative record (docket entry 33) is DENIED and that defendant's and WSI's motions for judgment on the administrative record (docket entries 32 and 34) are GRANTED.  Because this order resolves the case on the merits in favor of defendant, no preliminary or permanent injunction is necessary or warranted.  Therefore, the Court FURTHER ORDERS that HWA's motion for preliminary injunction (docket entry 5) is DENIED.  The Clerk is directed to enter judgment in favor of defendant.

The parties have designated certain information subject to the protective order (docket entry 12) entered in this action on August 22, 2007.  The Court therefore shall initially file this Opinion and Order under seal.  The parties shall review the Opinion and Order to determine whether, in their view, any information contained herein should be redacted prior to publication in accordance with the terms of the protective order.  The parties shall file, within 14 days of the filing of this Opinion and Order, a joint status report indicating what information, if any, they contend should be redacted and the reasons for such proposed redactions.

IT IS SO ORDERED.

   s/ George W. Miller     
GEORGE W. MILLER
Judge